UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. _____ |
| | : | |
| BALLY TOTAL FITNESS HOLDING<br>CORPORATION, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its complaint against defendant Bally Total Fitness Holding Corporation ("Bally" or "defendant"), alleges:

## NATURE OF THE ACTION

1.     In connection with its accounting over a several year period, Bally violated anti-fraud, reporting, record-keeping, and internal controls provisions of the federal securities laws. As described below, Bally made materially false and misleading statements about its financial condition in SEC filings and in other public statements from at least fiscal year 1997 through fiscal year 2003. These materially false and misleading statements portrayed Bally's financial condition (its net worth) and its performance (its income) as being far better than they actually were during the relevant period.

2.     These misrepresentations about its financial condition and performance were the result of Bally's employment of accounting methods that were not in conformity with generally accepted accounting principles ("GAAP"), and in at least certain instances, were fraudulent.

On November 30, 2005, Bally filed its 2004 Form 10-K, which restated its previously reported financial statements for the years ended December 31, 2002, and 2003, and restated selected financial data for the years ended December 31, 2001, and December 31, 2000. The restatement acknowledged more than two dozen different accounting improprieties that materially affected Bally's financial statements during the relevant period.

3.      Those accounting improprieties, which included frauds, had a pervasive effect on the accuracy of Bally's public financial statements. For example, Bally originally reported in its 2001 Form 10-K that its year-end 2001 shareholders' equity, or net worth, was positive $513 million. In truth, Bally's year-end 2001 net worth -- once all of the accounting improprieties were corrected -- was *negative* $1.3 *billion*. Simply put, Bally overstated its year-end 2001 net worth by $1.8 billion.

4.      Bally's overstatement of its year-end 2001 net worth was the result of Bally's accounting improprieties, which prematurely recognized revenue and deferred recognition of expenses. This enabled Bally to hide the enormous magnitude of its accumulated losses: through year-end 2001, those losses were $1.8 billion. Bally's losses should have been reflected, among other places, in Bally's retained earnings, or more precisely, in Bally's accumulated deficit. Retained earnings represent a firm's cumulative profits; accumulated deficit represents a firm's cumulative losses. Although Bally's originally reported year-end 2001 accumulated deficit was approximately $100 million, its actual accumulated deficit was $1.9 billion. The $1.8 billion understatement of Bally's accumulated deficit represents the amount of losses Bally incurred, but did not report, through December 31, 2001.

5.      Bally's accounting frauds and improprieties did not stop in 2001; they continued through 2003. As a result, Bally understated its originally reported 2002 net loss before income tax by $92.4 million. Bally also understated its originally reported 2003 net loss before income

2

tax by $90.8 million. In addition to being included in the annual Forms 10-K, these materially false and misleading financial statements were also included in registration statements (and amendments thereto) filed by Bally in 2001, 2002, and 2003.

**JURISDICTION**

6.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) & v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

7.     Defendant directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

**DEFENDANT**

8.     Bally is a publicly-held company organized in Delaware with securities registered with the SEC pursuant to Section 12(b) of the Exchange Act. Until May 2, 2007, Bally's securities traded on the New York Stock Exchange. On May 2, 2007, before the market opened, trading in Bally common stock on the New York Stock Exchange was suspended. On July 31, 2007, Bally filed for reorganization under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. On October 1, 2007, Bally emerged from the reorganization as a privately held corporation.

**STATEMENT OF FACTS**

9.     Each of Bally's accounting frauds and improprieties is described below. Described first are those that principally served to overstate Bally's gross revenue, and thus overstate Bally's net income (or understate Bally's net loss). Described next are those that principally served to understate Bally's expenses, and thus overstate Bally's income (or

3

understate Bally's loss). Described last are those that served to understate Bally's accumulated deficit as of December 31, 2001, and thus overstate Bally's net worth.

## BALLY IMPROPERLY
## OVERSTATED ITS GROSS REVENUE

10.    As further described below, certain of Bally's accounting improprieties had the effect of improperly overstating Bally's income by recognizing revenue prematurely. Bally generated revenue by selling gym memberships, personal training services, and nutritional products. Bally improperly accounted for much of this revenue. For example, gym memberships generated two types of revenue for Bally: (1) initial membership fees, also called "initiation fees," and (2) monthly dues. Bally prematurely recognized revenue for initiation fees and monthly dues. Bally also failed to conform to GAAP when accounting for revenue from certain personal training services. Further, Bally sold packages that bundled together gym memberships, nutritional products, and personal training services, but failed to comply with GAAP in accounting for revenue from these packages.

## Bally Fraudulently Overstated its
## Gross Revenue from "Initiation Fees"

11.    Bally fraudulently and prematurely recognized revenue from initiation fees. As described above, part of the price of a Bally health club membership was a one-time initiation fee. This initiation fee was either paid in full when a member joined or was financed over a period of time, typically 36 months. Regardless whether the initiation fees were paid in full at the beginning of the membership, or financed over time, GAAP prohibited Bally from recognizing all the revenue from initiation fees immediately.

12.    Instead, GAAP required that Bally recognize initiation fee revenue over the entire membership life. This means that for members who maintained their memberships beyond the financing period, or initial period of membership, Bally was required to defer initiation fee

4

revenue and recognize it over the estimated membership life, not over the term of the initial period of membership. During the relevant period, however, Bally prematurely recognized its members' initiation fee revenue over a period that was not only shorter than the estimated membership life, but in most instances even shorter than the initial period of membership.

13.    In 1997, Bally adopted the "deferral method" of accounting for initiation fee revenue. The manner in which Bally applied the deferral method, however, recognized initiation fee revenue over a period that in most instances was even shorter than the term of the initial period of membership and was not in conformity with GAAP. In 2003, Bally switched to what it characterized as a "modified cash method" to account for initiation fee revenue. However, Bally also applied the modified cash method in a manner not in conformity with GAAP and as a result recognized all initiation fee revenue over the initial period of membership. In 2004, Bally acknowledged that the manner in which it implemented both the deferral method and the modified cash method were improper and not in conformity with GAAP.

14.    At least since 2000, Bally knew, or was reckless in not knowing, that its accounting for initiation fee revenue was not in conformity with GAAP and caused its financial statements to be misstated. As a result of Bally's premature recognition of initiation fee revenue, Bally in its 2001 Form 10-K understated its accumulated deficit as of December 31, 2001, by $997.8 million -- nearly a billion dollars. Additionally, because Bally had already prematurely recognized initiation fee revenue in prior periods, Bally in its 2002 Form 10-K was forced to overstate its 2002 net loss before income tax by $54.2 million, and in its 2003 Form 10-K was forced fraudulently to overstate its 2003 net loss before income tax by $9.3 million.

## Bally Fraudulently Overstated its
## Gross Revenue from "Prepaid Dues"

15.    Bally also fraudulently recognized revenue from "prepaid dues." Prepaid dues revenue came about when a Bally health club member elected to renew his or her membership for an additional period of time after completing the initial membership contract term. A renewing member could elect to prepay his or her renewal dues. These prepayments were referred to as prepaid dues.

16.    GAAP required Bally to recognize prepaid dues revenue as monthly health club services were provided. When dues were prepaid, the prepaid portion was to be deferred and recognized as it was earned. From 1997 through 2003, however, Bally improperly accelerated revenue from prepaid dues by recognizing as revenue the entire amount of the prepaid dues in the month the payment was received, instead of recognizing it over the period for which that member had prepaid.

17.    Beginning in at least 2000, Bally knew that it was improperly accelerating revenue from prepaid dues, but failed to assess the scope of the problem or to fix it. Eventually, Bally publicly acknowledged "errors" regarding prepaid dues for prior periods. In its 2003 Form 10-K, Bally restated its prepaid dues revenue for prior periods going back to 1997 because, as the company reported, its previous methodology resulted in "errors in calculating prepaid dues and accelerated dues recognition for certain prepaying members."

18.    Bally knew, or was reckless in not knowing, that it was accounting for prepaid dues revenue in a manner that was not in conformity with GAAP and caused Bally's financial statements to be misstated. As a result of Bally's premature recognition of prepaid dues revenue, Bally in its 2001 Form 10-K understated its accumulated deficit as of December 31, 2001, by $35 million. Further, Bally's premature recognition of prepaid dues caused it to overstate its

6

2001 net income before tax by $10.6 million in its 2001 Form 10-K and to understate its 2002

net loss before tax by $8.0 million in its 2002 Form 10-K.

### Bally Fraudulently Overstated its
### Gross Revenue from "Reactivation Fees"

19.    Bally also fraudulently recognized revenue from unpaid dues on inactive

memberships. Not all Bally members who completed their initial membership contract term

renewed their membership. Instead, they simply ceased paying dues. Those members who had

paid all amounts due under the initial membership contract, but who had then stopped paying

monthly dues for six months or longer were solicited by Bally for "reactivation." Bally's

"reactivation" offer permitted lapsed members to rejoin by paying a "reactivation fee," which

was lower than an "initiation fee."

20.    GAAP prohibited Bally from recognizing any revenue from "reactivation fees"

until after the reactivating members had entered into binding contracts. Rather than complying

with GAAP and waiting until Bally had obtained customer acceptance and the reactivating

members had entered into binding contracts, Bally simply projected the number of reactivating

members that it anticipated rejoining up to three years into the future, and then recognized those

anticipated but hypothetical reactivation fees as revenue. Bally recognized that hypothetical

revenue over a period composed of (a) the average delinquent period (that is, the period between

when members stopped paying their monthly dues and when they reactivated) plus (b) the

average reactivation period.

21.    In 2003, Bally abandoned this methodology and adopted a modified cash basis of

accounting for reactivation fees. Subsequently, in its 2004 Form 10-K, Bally acknowledged that

its prior accounting failed to comply with GAAP, admitting that "recording revenue associated

with anticipated reactivating members was contrary to GAAP requirements of a binding

7

agreement and customer acceptance." Bally also admitted that it "should have adopted the cash basis for recoveries of unpaid dues on inactive memberships prior to 2003."

22.     Bally knew, or was reckless in not knowing, that it was accounting for reactivation fees in a manner that was not in conformity with GAAP and caused Bally's financial statements to be misstated. As a result of Bally's premature recognition of reactivation fees, in its 2001 Form 10-K, Bally understated its accumulated deficit as of December 31, 2001, by $21.8 million.

### Bally Improperly Overstated its Gross Revenue from "Multiple Element Arrangements"

23.     In addition to selling health club services, personal training services, and nutritional products as separate services or products, Bally also sold packages that included a combination of all three. In accounting terms, these packages are known as "multiple element arrangements." GAAP requires that revenue from multiple elements be treated as a single element unless it meets certain requirements which Bally did not meet.

24.     During the relevant period, however, Bally failed to account for multiple element arrangements in conformity with GAAP. Instead, Bally treated the sale of nutritional products, the sale of personal training services, and the sale of membership contracts as separate elements which allowed Bally to inappropriately prematurely record revenue. In 2004, Bally changed its accounting method to treat the income from these arrangements as a single element and to recognize the revenue from these arrangements on a straight line basis over the later of when collected or earned.

25.     As a result of Bally's premature recognition of revenue from multiple element arrangements, in its 2001 Form 10-K, Bally understated its accumulated deficit as of December 31, 2001, by $105.5 million. Further, Bally understated its 2002 net loss before tax by

$86.5 million, and in its 2003 Form 10-K, understated its 2003 net loss before tax by
$33 million.

### Bally Improperly Overstated its Gross
### Revenue from Prepaid Personal Training Services

26.     In addition to selling health club memberships, Bally also sold personal training

services, that is, exercise sessions with personal trainers. Some customers prepaid for sessions

with personal trainers. GAAP requires that revenue from prepaid personal training services be

recognized only when earned; that is, when the personal training services were actually provided.

Bally, however, failed to account for prepaid personal training services revenue in conformity

with GAAP, and instead recognized revenue related to prepaid personal training services before

those services were actually provided. As a result of its premature recognition of prepaid

personal training services revenue, Bally in its 2002 Form 10-K understated its 2002 net loss

before income tax by $7.9 million, and in its 2003 Form 10-K, understated its 2003 net loss

before income tax by $4.6 million.

### Bally Improperly Overstated its Gross
### Revenue from the Sale of Future Receivables

27.     Finally, in addition to generating revenue from the sale of health club

memberships and related products, Bally also generated revenue selling future receivables.

GAAP required that sales of future receivables be treated as debt. During the relevant period,

however, Bally failed to comply with GAAP and instead accounted for sales of future

receivables as the sale of financial assets. This practice had the effect of prematurely

recognizing revenue from the sales of future receivables. As a result of adopting accounting for

revenue in conformity with GAAP, the company had to amend its accounting treatment of the

sale of receivables from the sale of financial assets to debt treatment. Bally's use of the non-

9

GAAP accounting treatment caused in its 2002 Form 10-K to understate its 2002 net loss before income tax by $281,000.

## BALLY IMPROPERLY
## UNDERSTATED ITS EXPENSES

28.     The accounting described above had the effect of overstating Bally's revenue during the relevant period, and thus falsely improving Bally's publicly reported financial performance. In addition, other accounting improprieties by Bally improperly improved Bally's publicly reported financial performance by understating the expenses Bally incurred in operating its chain of health clubs. Those expenses included the cost of paying interest on a bond issued by a health club Bally acquired. Bally's expenses also included the costs of signing up new members who visited Bally's facilities, such as sales people's salaries, as well as the costs of advertising to attract potential new members to visit its facilities. Bally's expenses further included the costs of leasing, operating, and maintaining hundreds of health clubs in the United States and Canada, as well as the cost of acquiring or opening new clubs. Between 1997 and 2002, Bally focused on growing by acquiring already existing health clubs or by developing new clubs. During that time, Bally bought or opened 152 new fitness centers.

29.     As described below, Bally understated its expenses by a variety of means. It understated one expense by failing to record a liability it in its public financial statements. It understated certain other current expenses by treating them as capital assets, which enabled Bally improperly to defer recognizing those expenses until years later and thus understate its current expenses while providing Bally with a short-term boost to its financial statements.

## Bally Fraudulently Capitalized and
## Deferred its "Membership Acquisition Costs"

30.     In 1997, at the same time that Bally began fraudulently to apply the deferral method of accounting for "initiation fees," Bally also began fraudulently to account for so-called

"membership acquisition costs." "Membership acquisition costs" were supposed to be the costs that would not have been incurred, but for entering into particular member agreements. Under GAAP, costs that were directly related to the acquisition of a contract were required to be capitalized and amortized as an expense over the same period that the deferred revenue from the contract was recognized. All other costs were required to be charged to expense as incurred.

31.    Notwithstanding GAAP, Bally deferred costs that were not directly related to the acquisition of membership contracts. For example, Bally deferred 100% of its sales force's salaries between 1997 and 2003, despite its failure to analyze the extent to which those salaries related to successful sales efforts. During that same period, Bally also deferred as "membership acquisition costs" 33% of all its Management Information Systems department's costs. It did so even though its MIS department costs included such non-contract-acquisition items as depreciation, repairs and maintenance, equipment rental, supplies, professional fees and utilities. Bally also deferred as "membership acquisition costs" 100% (and later, 39%) of insufficient funds charges, bank charges, and credit card charges during that same period.

32.    Bally knew, or was reckless in not knowing, that its practice of deferring as "membership acquisition costs" costs that were not directly related to the acquisition of membership contracts failed to comply with GAAP and misstated Bally's financial statements. This practice caused Bally in its 2001 Form 10-K to understate its accumulated deficit as of December 31, 2001, by $114 million. It also caused Bally to understate in its 2002 Form 10-K its 2002 expenses by $6.5 million, and to overstate in its 2003 Form 10-K its 2003 expenses by $1 million.

11

### Bally Improperly Understated
### its "Holiday Bonds" Expense

33.    Bally understated its expenses by failing to include the interest expense associated with a liability, the so-called Holiday bonds, in its public financial statements. As a result of acquiring another health club, Holiday Health Clubs of Towson, in the late 1980s, Bally assumed certain bonds that Holiday had issued to its members. Those bonds imposed on Bally a $22 million face value repayment obligation, due in approximately 2015. When Bally acquired Holiday, Bally added the Holiday bond liability to its balance sheet, and recognized an annual interest expense associated with paying off the Holiday bonds. In 1995, however, Bally removed the Holiday bond liability from its public accounting financial statements.

34.    From 1995 to 2003, the Holiday bonds liability was not reflected on Bally's public financial statements and Bally's public financial statements did not reflect any interest expense related to Bally's obligation to repay the Holiday bonds. For tax purposes, however, Bally continued to record the interest expense related to those bonds.

35.    Bally's failure to reflect the Holiday bonds liability on its public financial statements was not in conformity with GAAP and caused Bally's financial statements to be misstated. As a result of Bally's omission of the Holiday bonds liability from its financial statements, Bally in its 2002 Form 10-K understated its 2002 interest expense by $526,000, and in its 2003 Form 10-K understated its 2003 interest expense by $589,000. Further, Bally's failure to reflect the Holiday bond liability caused Bally's 2001 Form 10-K to understate its accumulated deficit as of December 31, 2001, by $4.3 million.

### Bally Improperly Capitalized and
### Deferred its Advertising Expense

36.    During the relevant period, Bally understated its advertising expense by improperly capitalizing rather than expensing, no later than the first time the advertising took

12

place, the costs of producing its advertisements. Specifically, Bally deferred recognizing the production costs of its advertisements over the estimated life of the advertisements. This was not in conformity with GAAP, and resulted in an understatement of advertising expense. As a result, Bally's 2001 Form 10-K understated Bally's accumulated deficit as of December 31, 2001, by $3.3 million. Because Bally had understated its advertising expense in prior years, in its 2002 Form 10-K, Bally overstated its 2002 expenses by $525,000, and in its 2003 Form 10-K, Bally overstated its 2003 expenses by $3.4 million.

## Bally Improperly Understated the Expenses it Incurred in Acquiring Other Health Clubs

37.     Between 1997 and 2002, Bally acquired a number of other health club companies. Those business combinations were accounted for using the purchase method of accounting. The purchase method of accounting required that the tangible assets and liabilities of the acquired company be recorded on Bally's books at fair market value. If the purchase price for the acquired business exceeded the net fair market value of the acquired business's tangible assets and liabilities, then that excess purchase price was to be attributed in the first instance to identifiable intangible assets, such as existing customer relationships, trademarks, and non-competition agreements. Any remaining excess purchase price was to be attributed to the unidentified intangible asset, commonly known as "goodwill."

38.     At the beginning of the relevant period, GAAP required that goodwill be amortized -- that is, removed from the balance sheet and moved to the income statement as an expense -- over the useful life of the goodwill, which could not exceed 40 years. During the relevant period, GAAP's treatment of goodwill changed. Goodwill was no longer required to be amortized; instead, companies having goodwill on their books were required to conduct a periodic "impairment analysis." The "impairment analysis" tested whether the goodwill's fair

13

value continued to match its carrying amount, or book value. If the analysis concluded that the fair value of the goodwill no longer matched its book value, then the goodwill's book value was written down to reflect the fair value determined by the impairment analysis. The difference between book value and fair value was expensed.

39.    Bally's application of the purchase method of accounting failed to conform with GAAP in at least two ways. First, prior to the release of its 2004 Form 10-K, Bally's method of allocating the purchase prices of acquired businesses failed to comply with GAAP and resulted in an overstatement of goodwill and corresponding understatement of expense. This is because Bally failed properly to allocate a portion of the purchase price to certain separately identifiable intangible assets, namely, "Membership Relations," "Non-compete Agreements," "Trade Name," and "Leasehold Rights." Second, Bally's method of amortizing goodwill, and later conducting (or failing to conduct) impairment analyses, also failed to comply with GAAP and resulted in an overstatement of goodwill and a corresponding understatement of expense.

40.    As a result of Bally's improper application of GAAP to its goodwill, Bally in its 2002 Form 10-K understated its 2002 expenses by $14.1 million, and in its 2003 Form 10-K, understated its 2003 expenses by $60.9 million.

## Bally Improperly Understated its Lease Expenses

41.    Bally leased rather than owned numerous of its facilities, and during the relevant period, Bally's lease accounting was not in conformity with GAAP for a variety of reasons. First, Bally improperly failed to recognize rent expense on club leases with escalating rental obligations using the required straight-line rent method. Second, Bally improperly reflected tenant allowances as a reduction of property and equipment on the balance sheet and improperly amortized these amounts and the related leasehold improvements to depreciation expense. Third, Bally improperly reflected tenant allowances as a component of cash flows from investing

14

activities in its statement of cash flows. Fourth, Bally improperly failed to depreciate leasehold improvements over the lesser of the asset's economic life, with a maximum of fifteen years, or the contractual term of the lease, excluding all renewal options. As a result of Bally's improper application of GAAP to its lease obligations, Bally in its 2002 Form 10-K understated its 2002 expenses by $13.9 million, and in its 2003 Form 10-K, understated its 2003 expenses by $11.4 million.

<b>Bally Improperly Deferred the Costs it<br>Incurred in Building out its Health Clubs</b>

42.    During the relevant period, various Bally clubs were temporarily closed while Bally undertook construction in preparation for use by members. Although the clubs were closed, Bally nonetheless incurred rent costs during the construction periods (so-called "presale costs"). Under GAAP, presale costs are to be recognized as expense when incurred unless certain requirements are met. Bally failed to meet those requirements, but nonetheless improperly deferred recognition of presale costs. As a result, Bally in its 2002 Form 10-K understated its 2002 expenses by $2.3 million, and in its 2003 Form 10-K, understated its 2003 expenses by $967,000.

43.    In addition to incurring rent while clubs were closed for remodeling and construction, Bally also incurred certain internal compensation costs ("capitalized maintenance costs"). Although GAAP required that these costs be recorded as expense when services were rendered, Bally improperly capitalized and deferred these costs and recognized them as expense in later periods. As a result, Bally in its 2002 Form 10-K understated its 2002 expenses by $3.5 million, and in its 2003 Form 10-K, overstated its 2003 expenses by $3.0 million.

### Bally Improperly Failed to Record
### Expenses Associated with its Assets

44.    During the relevant period, Bally improperly failed to account for its fixed assets

in conformity with GAAP.  GAAP required that Bally periodically analyze whether its fixed

assets' value had been impaired by certain kinds of events, and if so, to recognize the amount of

impairment as an expense.  Bally, however, failed to identify the existence of events that should

trigger an asset impairment analysis, and failed to measure the related impairment charges.  As a

result, Bally in its 2002 Form 10-K understated its 2002 expenses by $766,000, and in its

2003 Form 10-K, understated its 2003 expenses by $5.2 million.

45.    Similarly, during the relevant period, Bally improperly failed to account for its

long-lived assets apart from goodwill and fixed assets in conformity with GAAP.  As a result,

Bally in its 2002 Form 10-K understated its 2002 expenses by $600,000, and in its 2003 Form

10-K, understated its 2003 expenses by $2.2 million.

### Bally Improperly Accounted for its
### Exercise Equipment Inventory Expense

46.    During the relevant period, Bally's method of accounting for equipment trade-ins

failed to comply with GAAP and resulted in an overstatement of the cost basis and resulting

aggregate depreciation expense for Bally's investment in exercise equipment.  As a result, Bally

in its 2002 Form 10-K understated its 2002 depreciation expense by $1.1 million, and in its 2003

Form 10-K, overstated its 2003 depreciation expense by $1.6 million.

### Bally Improperly Accounted for
### its Deferred IT Services Expense

47.    During the relevant period, Bally's method of accounting for the internal and

external costs it incurred in developing internal-use computer software failed to comply with

GAAP.  Instead, Bally improperly deferred recognition of those expenses.  As a result, Bally in

its 2002 Form 10-K understated its 2002 expenses by $2.2 million, and in its 2003 Form 10-K, understated its 2003 expenses by $424,000.

### Bally Improperly Accounted
### for its Self-insurance Expenses

48.     During the relevant period, Bally self-insured itself against workers' compensation, health, life, and general insurance claims. Bally's methodologies for estimating those claims, however, resulted in an understatement of Bally's expenses relating to its self-insurance liabilities. As a result, Bally in its 2002 Form 10-K understated its 2002 expenses by $3.9 million, and in its 2003 Form 10-K, overstated its 2003 expenses by $2.8 million.

### Bally Improperly Understated
### its Escheatment Obligations

49.     During the relevant period, Bally understated its liability for the potential escheatment of payroll-related and supplier-related checks. As a result, Bally in its 2002 Form 10-K understated its 2002 expenses by $610,000, and in its 2003 Form 10-K, understated its 2003 expenses by $1.2 million.

### Bally Improperly Failed to Expense Other Costs

50.     In addition to the instances described above, Bally also understated its expenses by capitalizing various other costs, none of which was individually significant, but which GAAP required to have been recognized as expenses when they were incurred. This improper capitalization of expenses caused Bally in its 2001 Form 10-K to understate its accumulated deficit as of December 31, 2001, by $8.0 million. Additionally, it caused Bally in its 2002 Form 10-K to understate its 2002 expenses by $442,000, and in its 2003 Form 10-K, to overstate its 2003 expenses by $2.8 million.

## BALLY IMPROPERLY UNDERSTATED
## ITS ACCUMULATED DEFICIT

51.    Bally engaged in other accounting improprieties that resulted in it understating its accumulated deficit, and thus materially overstating its net worth.

### Bally Improperly Accounted for
### Gains and Losses from its Canadian Operations

52.    During the relevant period, Bally operated health clubs in Canada. Bally failed properly to account for changes in currency exchange rates in determining gains and losses resulting from transactions in Canada. This caused Bally in its 2001 Form 10-K to understate its accumulated deficit as of December 31, 2001, by $2.3 million. It also caused Bally in its 2002 Form 10-K to fail to report gains of $1.7 million in 2002, and in its 2003 Form 10-K, to fail to report gains of $2.4 million in 2003.

### Bally Improperly Overstated
### the Value of its Retail Inventory

53.    During the relevant period, Bally overstated the value of its retail inventories, primarily as a result of (a) differences in physical count and (b) incorrect accounting for cost of goods sold. As a result, Bally in its 2001 Form 10-K understated its accumulated deficit as of December 31, 2001, by $2.2 million; in its 2002 Form 10-K, overstated its 2002 expenses by $538,000; and in its 2003 Form 10-K, understated its 2003 expenses by $594,000.

### Bally Failed Properly to Record
### its Period-end Accruals

54.    During the relevant period, Bally also failed to properly accrue certain obligations at the end of its accounting periods. This caused Bally in its 2001 Form 10-K to understate its accumulated deficit as of December 31, 2001, by $4.1 million. It also caused Bally in its 2002 Form 10-K to understate its 2002 expenses by $519,000, and in its 2003 Form 10-K to understate its 2003 expenses by $259,000.

**Bally's Miscellaneous Other**
**Failures to Conform to GAAP**

55.    As Bally acknowledged in the restatement contained in its 2004 Form 10-K, Bally

also failed to comply with GAAP in connection with a number of other items during the relevant

period, none of which were individually significant.  This caused Bally in its 2001 Form 10-K to

understate its accumulated deficit as of December 31, 2001, by $9.6 million.  It also caused Bally

in its 2002 Form 10-K to understate its 2002 income before taxes by $2.5 million, and in its 2003

Form 10-K, to understate its 2003 income before taxes by $4.4 million.

**FIRST CLAIM FOR RELIEF**

**Fraud**
**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)],**
**Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and**
**Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]**

56.    Paragraphs 1 through 22 and paragraphs 30 through 32 are re-alleged and

incorporated by reference.

57.    By reason of the foregoing, defendant directly or indirectly, knowingly or

recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in

connection with the offer, sale, or purchase of securities:  (a) employed devices, schemes or

artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact

necessary to make the statements made, in the light of the circumstances under which they were

made, not misleading; (c) obtained money or property by means of any untrue statement of a

material fact or any omission of a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (d) engaged in

transactions, acts, practices, or courses of business which operated as a fraud or deceit upon other

persons.

58.    By reason of the foregoing, defendant violated, and unless restrained will violate, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.

## SECOND CLAIM FOR RELIEF

**Reporting**
**Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)]**
**and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13**
**[17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 & 240.13a-13]**

Paragraphs 1 through 55 are re-alleged and incorporated by reference.

59.    The Exchange Act and rules promulgated thereunder require every issuer of a registered security to file reports with the SEC that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.  In addition to the materially inaccurate Forms 10-K identified above, during the relevant period, Bally also filed materially inaccurate Forms 10-Q and 8-K.

60.    By reason of the foregoing, defendant violated, and unless restrained will violate, violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

## THIRD CLAIM FOR RELIEF

**Record Keeping and Internal Controls**
**Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**
**[15 U.S.C. § 78m(b)(2)(A) and 78m(b)(2)(B)]**

61.    Paragraphs 1 through 55 are re-alleged and incorporated by reference. The Exchange Act and rules promulgated thereunder require each issuer of registered securities: (a) to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the business of the issuer; and (b) to devise and maintain a system of internal controls sufficient to provide reasonable assurances that, among other things, transactions are

recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria.

62.    By reason of the foregoing, defendant violated, and unless restrained will violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a final judgment:

(a)    permanently enjoining defendant from violating Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13; and

(b)    granting such other relief as this Court may deem just and appropriate.

Dated:  February 28, 2008

Washington, D.C.

By:    _(signature)_

Alan M. Lieberman
Robert E. Leidenheimer, Jr.
U.S. Securities & Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549
Tel.: 202-551-4474 (Lieberman)
Fax: 202-9 (Lieberman)
Email: LiebermanA@sec.gov

Of Counsel:

Fredric D. Firestone
Kenneth R. Lench
David Kagan-Kans

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|

**I (a) PLAINTIFFS**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Alan M. Lieberman, Esq.
U.S. Securities & Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549
202-551-4474

**DEFENDANTS**

BALLY TOTAL FITNESS HOLDING CORPORATION

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)    88888
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

William R. Baker III, Esq.
Latham & Watkins
555 Eleventh Street, NW
Suite 1000
Washington DC 20004-1304
202-637-1007

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ⦿ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions** (if Privacy Act) | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |
| | *(If pro se, select this deck)* | *(If pro se, select this deck)* | |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities- Employment**<br>☐ **446 Americans w/Disabilities- Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

⊙ **1 Original Proceeding**   ○ **2 Removed from State Court**   ○ **3 Remanded from Appellate Court**   ○ **4 Reinstated or Reopened**   ○ **5 Transferred from another district (specify)**   ○ **6 Multi district Litigation**   ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

This is principally an accounting fraud action under 15 U.S.C. §§ 77q(a) & 78j(b).

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | **DEMAND $** injunctive relief only<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

**DATE** 2/28/2008     **SIGNATURE OF ATTORNEY OF RECORD** *[signature]*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.